IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| RAYMOND JAMES & ASSOCIATES, INC., et al., | : : : | Case No. 1:25-cv-10 |
| | : | Judge Matthew W. McFarland |
| Plaintiffs, | : : | |
| v. | : : | |
| PAUL T. SABA, JR., | : : | |
| Defendant. | : | |

**ORDER GRANTING IN PART PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (Doc. 4)**

This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order (Doc. 4). Plaintiffs seek both a temporary restraining order and preliminary injunction in their Motion (Doc. 4). The Court will only address Plaintiffs' Motion for a Temporary Restraining Order at this time. The Court held a telephonic conference on January 15, 2025, as to this Motion, *see* S.D. Ohio Civ. R. 65.1(a), and it is now ripe for review. For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion and **ISSUES** a temporary restraining order.

### FACTS AS ALLEGED

**I.    The Parties**

Plaintiff Raymond James & Associates, Inc., ("Raymond James") is a public company providing diversified financial services. (Ver. Compl., Doc. 1, ¶ 20.) Plaintiffs Timothy VanBenthuysen and Richard Redvanly are employees of Raymond James'

1

Healthcare Investment Banking Group and work from its Atlanta office. (*Id.* ¶ 21.) Defendant Paul Saba, Jr. worked at Raymond James' Atlanta office as an investment intern during the summer of 2024. (*Id.* ¶ 22.) Defendant did not work in the Healthcare Investment Banking Group. (*Id.*) During the internship, Redvanly acted as Defendant's mentor. (*Id.* ¶ 23.) Defendant was not offered a full-time position with Raymond James at the conclusion of his internship. (*Id.* ¶ 24.) In August and September of 2024, Defendant emailed VanBenthuysen to inquire about potential full-time positions within the Healthcare Investment Banking Group, but VanBenthuysen informed Defendant that there were no openings at that time. (*Id.*)

## II. The Campaign

On November 4, 2024, using several fictitious email accounts, Defendant began a cyber-harassment campaign ("the Campaign") that spread false and malicious information about Plaintiffs. (Ver. Compl., Doc. 1, ¶ 2.) The emails, sent to fellow Raymond James employees, as well as individuals outside the company, accused Plaintiffs of illegal insider trading and rape; one email targeted Redvanly's girlfriend at her place of employment and accused her of illegal insider trading. (*Id.* ¶¶ 27-30.) In addition to the false accusations of criminal activity, some emails attempted to implicate Plaintiffs Redvanly and VanBenthuysen in inappropriate romantic relationships. (*Id.* ¶¶ 31-33.) In fact, on December 8, 2024, an email sent to both Raymond James employees and outside email addresses intended to impersonate VanBenthuysen and another employee; the email implied that the two were engaged in an extramarital affair and included sexually explicit images. (*Id.* ¶¶ 32-33.) A separate false account further distributed this

2

email to numerous members of the investment banking community, including firms that compete with Raymond James. (*Id.* ¶ 33.) Defendant sent a similarly explicit email on December 15, 2024, implicating VanBenthuysen and a different Raymond James employee by purporting to report explicit communications between the two; this email was similarly sent to both Raymond James employees and external recipients. (*Id.* ¶ 34.) On December 21, 2024, yet another fictitious email account sent an email to both Raymond James employees and external recipients, this time impersonating VanBenthuysen's wife and including another sexually explicit image taken from the internet. (*Id.* ¶ 36.) Plaintiffs allege that this conduct continued throughout the month of December 2024. (*Id.* ¶ 35.)

Then, on December 30, 2024, another email account impersonating a banker working for Raymond James invited numerous recipients external to Raymond James to join a fictitious neo-Nazi banking club. (Ver. Compl., Doc. 1, ¶¶ 41-42.) The email directed responses to VanBenthuysen's Raymond James email address and included a PDF attachment that advertised the fictitious neo-Nazi club. (*Id.* ¶ 42.) Raymond James' Cyber Threat Center, which had been working to uncover the perpetrator of these emails, examined the metadata on the attached PDF. (*Id.* ¶ 43-44.) The metadata revealed that Defendant was the author of the PDF. (*Id.* ¶ 44.)

On January 3, 2025, an additional false account sent a similar neo-Nazi banking club email with an attached PDF, and Defendant was again listed as the author of that PDF. (Ver. Compl., Doc. 1, ¶ 46-47.) The Cyber Threat Center also discovered that the visible digits of the recovery phone number for one of the fictitious email addresses

3

impersonating VanBenthuysen matched Defendant's phone number. (*Id.* ¶ 48-49.) Further investigation revealed that the recovery email for the fake VanBenthuysen account was another email address used in the Campaign. (*Id.* ¶ 51.) The Cyber Threat Center's findings led to the discovery of more connections between the multiple email accounts used in the Campaign. (*Id.* ¶ 52-53.) These email accounts all shared Defendant's phone number. (*Id.*)

Finally, on January 6, 2025, another email impersonating VanBenthuysen was sent to over 200 third-party recipients and included a similar neo-Nazi club invitation. (Ver. Compl., Doc. 1, ¶ 54.) As with the prior PDFs, Defendant was listed as the author on this invitation. (*Id.*) The same day, Raymond James' in-house counsel issued a cease-and-desist letter to Defendant by email, demanding that Defendant stop the Campaign. (*Id.* ¶ 55.) Defendant confirmed by phone that evening that he had received the letter. (*Id.* ¶ 56.) This was the first time Plaintiffs had informed Defendant that they had discovered he was the perpetrator of the Campaign. (*Id.* ¶ 57.) Plaintiffs are not aware of any further email attacks since the issuance of the letter. (*Id.*)

Due to the barrage of emails and resulting security threats, Raymond James closed its Atlanta offices on January 7 and 8, 2025. (Ver. Compl., Doc. 1, ¶ 37.) Plaintiffs have expended significant financial resources to repair the damage to their personal and professional reputations and to discover the source of the emails. (*Id.* ¶¶ 38-40.) Plaintiffs now bring claims for defamation, false light, intentional infliction of emotional distress, and telecommunications harassment under Ohio Rev. Code §§ 2307.60 and 2917.21 against Defendant. (*Id.* ¶¶ 58-78.)

4

### III. Attempted Service

Plaintiffs' counsel attached to the Motion a Certification of Attorney Ian D. Mitchell. (Doc. 4-1, Pg. ID 54-56.) In this document, Plaintiffs' counsel Ian Mitchell attested to the various attempts, both successful and not, to notify Defendant of the lawsuit and Motion. (Certification, Doc. 4-1, Pg. ID 54-56.) Specifically, Mitchell attested that, on January 10, 2025, he hired a process server to serve copies of the Complaint, Summons, and Motion for Temporary Restraining Order and Preliminary Injunction upon Defendant at his confirmed residential address. (*Id.* at Pg. ID 55.) Defendant was not present. (*Id.*) That evening, Mitchell also emailed copies of these documents to Defendant's confirmed email addresses, as well as the email address of Defendant's father, an attorney who had previously implied that he was representing his son. (*Id.*) Defendant's father responded to this email and confirmed he had received the filings but would not accept service on behalf of his son, who was purportedly in the hospital. (*Id.*) Plaintiffs' counsel attempted service on the Defendant several times and spoke to his father both over email and telephone about the matter. (*Id.* at Pg. ID 55-56.)

And, when scheduling the informal conference held on January 15, 2025, the Court emailed both Plaintiffs' counsel and the two confirmed email addresses of Defendant. It also indicated the date, time, and call-in information of the conference on the case's public docket via notation order. (*See* 1/13/2025 Notation Order.) The Court received no response either via email or telephone call from Defendant indicating his receipt or interest in attending the conference. Nobody attended the telephonic conference on behalf of Defendant. (*See* 1/16/2025 Minute Entry.)

5

**LAW & ANALYSIS**

Federal Rule of Civil Procedure 65 empowers the Court to issue a temporary restraining order against an adverse party. Fed. R. Civ. P. 65(b). The purpose of issuing a temporary restraining order is to preserve the status quo. *CUC Properties, LLC v. 1680 Carillon, LLC*, No. 1:12-cv-71, 2012 WL 540560, *1 (S.D. Ohio Feb. 17, 2012). This Court must consider four factors when determining whether to grant or deny a temporary restraining order: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the [temporary restraining order]; (3) whether issuance of the [temporary restraining order] would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the [temporary restraining order]." *Id.* (citing *Chabad of S. Oh. & Congregational Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004)). "These are factors to be balanced, not prerequisites that must be met." *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

As a preliminary matter, the Court will address the notice requirements as set out in Rule 65(b). Reasonable notice consists of information received within a reasonable time to allow the opposing party an opportunity to be heard. See *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). "The normal circumstance for which the district court would be justified in proceeding ex parte is where notice to the adverse party is impossible, as in the cases where the adverse party is unknown or is unable to be found[,] . . . [or] where notice to the defendant would render fruitless further prosecution of the action." *First Tech. Safety Sys., Inc. v.*

6

*Depinet,* 11 F.3d 641, 650 (6th Cir. 1993). Here, Plaintiffs have attempted multiple times and with multiple methods to serve Defendant with the Complaint and Motion. Defendant's father, an attorney, is aware of the lawsuit and has indicated he will not accept service on behalf of his son. At this point, Plaintiff has made reasonable efforts to give notice to Defendant. Defendant is seemingly unable to be found. Therefore, the Court is justified in proceeding ex parte on the Motion for Temporary Restraining Order. *See, id.*

## I. First Amendment Implications as to Free Speech

Though temporary restraining orders usually rise or fall on the four well-established factors, "when First Amendment rights are implicated, the[se] factors . . . essentially collapse into a determination of whether restrictions of First Amendment rights are justified to protect competing constitutional rights." *Cnty. Sec. Agency v. Ohio Dep't of Com.*, 296 F.3d 477, 485 (6th Cir. 2002). A portion of Plaintiffs' requested relief directly implicates the First Amendment by seeking to enjoin Defendant from "[s]ending . . . any emails or other communications" about the Plaintiffs, employees of Raymond James, or the significant others of VanBenthuysen and Redvanley, and from "[p]ublishing defamatory material" about them. (Motion, Doc. 4, Pg. ID 33.) This amounts to a "classic example" of a prior restraint—"just a fancy term for censorship." *Cnty. Sec. Agency,* 296 F.3d at 485; *McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015).

In considering a temporary restraining order that involves a "prior restraint on pure speech, the hurdle is substantially higher: publication must threaten an interest more fundamental than the First Amendment itself." *Procter & Gamble Co. v. Bankers Tr.*

7

*Co.*, 78 F.3d 219, 227 (6th Cir. 1996). The proponent of a prior restraint must overcome the "heavy presumption against its constitutional validity." *Id*. (quoting *New York Times Co. v. United States,* 403 U.S. 713, 714 (1971)). This caution makes sense. After all, "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (characterizing prior restraints as "the most serious and the least tolerable infringement on First Amendment rights").

Traditionally, "equity does not enjoin a libel or slander and [] the only remedy for defamation is an action on damages." *Saidak v. Schmidt*, 501 F. Supp.3d 577, 595 (E.D. Tenn. Nov. 20, 2020); *see also Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987). Courts following the colloquially named "modern rule" have developed a carveout for "a narrow and limited injunction" in specific circumstances. *Saidak*, 501 F. Supp.3d at 595. But, even then, there is an important qualification: "It is clear that where this 'modern rule' has been followed, there has been an adjudication of the merits before a permanent injunction has issued, and the judge or jury has made a final determination that the statements to be enjoined are false and libelous." *Id.* at 596 (collecting cases); *see also Goodson v. Republican State Leadership Comm. - Jud. Fairness Initiative*, No. 4:18-CV-791, 2018 WL 6430825, at *3 (E.D. Ark. Nov. 1, 2018) ("It appears wholly unprecedented, however, for a federal court to enter a preliminary injunction in a defamation case."); *Banks v. Jackson*, No. 120-CV-2074, 2020 WL 6870739, at *2 (D. Colo. Oct. 2, 2020) ("[A]

8

*preliminary* prior restraint, which is at issue here, is, in fact, something the court cannot do.").

Relevant to our inquiry herein is *Lothschuetz v. Carpenter,* 898 F.2d 1200, 1209 (6th Cir. 1990), which announced the Sixth Circuit's holding on the question of issuing an injunction against defamatory statements. Though the court would enjoin the defendant from making defamatory statements, it would "limit the application of such injunction to the statements which have been found in this and prior proceedings to be false and libelous." *Id.* Because the defendant in *Louthschetz* had defaulted on the question of liability, this amounted to an adjudication on the merits. *See id.* at 1203.

The Court also finds *Saidak v. Schmidt*, 501 F. Supp.3d 577 (E.D. Tenn. Nov. 20, 2020), persuasive given its similarity to the posture and alleged facts here. In *Saidak*, the plaintiff sued the defendant for defamation and sought to prevent further defamatory statements in furtherance of the defendant's "calculated campaign to defame, slander, and libel Plaintiff." *Id.* at 580. Specifically, the plaintiff sought to preliminarily enjoin the defendant from making any public comments about the plaintiff, his business, the lawsuit, or members of plaintiff's family. *Id.* at 589. However, the court denied this request because it amounted to a prior restraint before a final adjudication on the merits had concluded that the statements were, in fact, defamatory. *Id.* at 596-97. Preliminarily enjoining the alleged defamatory speech would have required the court to evaluate the speech and "at a minimum, pass judgment on the truth or falsity of that speech and its potential for harm." *Id.* (quotation omitted).

Thus is the case here. The Court cannot grant Plaintiffs' broad request to enjoin

9

Defendant's speech at this time because it would amount to a prior constraint before a final adjudication. This is not to diminish the gravity of the allegations in this case, or the effects felt by Plaintiffs. But, as explained, the First Amendment and the corpus of case law on this point is unmistakable: the Court cannot preliminarily enjoin Defendant's speech—let alone in an overbroad or imprecise manner—before a final adjudication on the merits. *See, e.g., Renoir-Large v. Lane*, No. 2:11-CV-23, 2011 WL 3667424, at *4 (S.D. Ohio July 20, 2011), *report and recommendation adopted*, No. 2:11-CV-0023, 2011 WL 3678177 (S.D. Ohio Aug. 22, 2011) (denying preliminary injunction because there had been no final determination and also noting the requested relief extended well beyond the allegedly defamatory statements previously made by the defendant); *Oakley, Inc. v. McWilliams*, 879 F. Supp. 2d 1087, 1088 (C.D. Cal. 2012) (denying preliminary injunction on "prior restraint" grounds for defendant who had allegedly sent harassing emails to other employees, associates, and industry personnel with accusations of criminal activity, infidelity, and attachments of pornographic images).

After thorough consideration and review, rather than enjoin Defendant from speaking to or about Plaintiffs, the Court restricts Defendant from accessing the email accounts previously used in the Campaign, as well from creating new email accounts in furtherance of the Campaign. In this way, the Court enjoins Defendant from continuing his course of conduct without issuing a prior restraint on his speech.

 II.  **Likelihood of Success**

"The moving party need only show a likelihood of success on the merits on one claim where there are multiple claims at issue in the complaint." *J.P. Morgan Securities,*

10

*LLC v. Duncan*, No. 2:22-CV-11732, 2022 WL 3325514, *4 (E.D. Mich. Aug. 11, 2022). This Court will consider the likelihood of Plaintiffs' success on their defamation claim against Defendant. (Ver. Compl., Doc. 1, ¶¶ 58-62.)

A federal court exercising diversity jurisdiction must apply the substantive law of the forum state. *State Auto Prop. & Cas. Ins. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015). Thus, this Court will analyze Plaintiffs' defamation claim under the four elements found in Ohio defamation law: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 611 N.E.2d 955, 962 (Ohio Ct. App. 1992)). Considering the evidence provided to the Court at this time, Plaintiffs have established each element.

    a. **False Statement**

Looking to the first element of Plaintiffs' defamation claim, a false statement is one that "sets forth matters which are not true or statements without grounds in truth or fact." *Yacko v. GM Co.*, No. 1:23-CV-01578, 2024 WL 866321, at *9 (N.D. Ohio Feb. 28, 2024) (quotations omitted). "Courts determine whether a statement is a false statement of fact, as opposed to an opinion, by considering the totality of circumstances." *Greer v. Harreld*, No. 2:24-CV-1237, WL 27380, at *5 (S.D. Ohio Jan. 3, 2025). Some factors the court may consider are: "the specific language used, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared." *Id*.

11

(citing *Carr v. Educ. Theatre Ass'n*, 215 N.E.3d 584, 591 (Ohio Ct. App. 2023)).

Notable here, Defendant sent two emails to individuals employed by Raymond James, as well as to others outside of the company, stating that Plaintiffs Vanbenthuysen and Redvanly had been convicted of rape. (Ver. Compl., Doc. 1, ¶¶ 27-29.) Defendant's specific statements are verifiably false, and inappropriate in the context of professional email communications. Thus, the first element is satisfied.

### b. Publication

Turning to the second element of defamation, Plaintiffs must show that there was a publication to a third party. *Harris*, 513 F.3d at 522. For a defamation claim, publication is simply defined as "communication to a third party." *Green v. Mason*, 504 F. Supp.3d 813, 830 (S.D. Ohio 2020) (quoting *Byrne v. Univ. Hosp.*, No. 95971, 2011 WL 3630483, at *7 (Ohio Ct. App. Aug. 18, 2011)). Here, Defendant sent emails to "individuals outside the company" falsely accusing Plaintiffs Vanbenthuysen and Redvanly of criminal convictions. (Ver. Compl., Doc. 1, ¶¶ 27-29.) Since these emails were sent to individuals who are third parties to this matter, the second element is also satisfied.

### c. Fault

For the third element, Defendant must have been at fault for publishing the defamatory statement. *Harris*, 513 F.3d at 522. "Fault for publication can either be intentional or negligent." *Macklin v. Turner*, No. 1:03-CV-2347, 2005 WL 2211170, at * (N.D. Ohio Sept. 9, 2005). In the current matter, Defendant's conduct in publishing the defamatory emails rises to the level of intentionality. Defendant created a network of fictious email addresses to spread numerous false statements about Plaintiffs. (Ver.

12

Compl., Doc. 1, ¶¶ 26-54.) The repeated nature of Defendant's conduct does not suggest an accident or negligence. Rather, Defendant's scheme displays a specific intent to publish the defamatory statements. Thus, Defendant was at fault for publishing the defamatory materials.

### d. Special Harm

The last element requires a showing of "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Harris*, 513 F.3d at 522. A publication is actionable, and the plaintiff need not show special harm, if it contains "written statements which falsely charge the plaintiff with the commission of a crime." *Shafer v. Karric Square Props., LLC*, 2:17-CV-1098, 2019 U.S. Dist. LEXIS 47021, at *20 (S.D. Ohio, Mar. 21, 2019) (quoting *Shepard v. Griffin Servs., Inc.*, No. 19032, 2002 WL 940110, at *9 (Ohio Ct. App. 2002)). Here, Defendant falsely charged Plaintiffs Vanbenthuysen and Redvanly of being convicted for rape in his emails to individuals within Raymond James and outside the company. (Ver. Compl., Doc. 1, ¶¶ 2-29.) Thus, the emails, on their face, appear defamatory. *Shafer*, 2019 U.S. Dist. LEXIS 4702 at *20. Having satisfied all the factors, Plaintiffs have established, for the purposes of a temporary restraining order, a strong likelihood of success on the merits of its defamation claim.

### III. Irreparable Harm

A sufficient showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," and receives "increased emphasis" as a factor within the temporary restraining order context. *Blount Pride, Inc. v.*

*Desmond*, 690 F. Supp. 3d 796, 807 (E.D. Tenn. 2023) (citations omitted). A harm is irreparable when it "is not fully compensable by monetary damages." *Overstreet v. Lexington–Fayette Urban Cty. Gov't,* 305 F.3d 566, 578 (6th Cir. 2002).

Plaintiffs argue that, without a temporary restraining order from this Court, they will continue to suffer "immediate and irreparable injury and damages to their reputation and business." (Motion, Doc. 4, Pg. ID 44.) In this Circuit, the "loss of customer goodwill often amounts to irreparable injury." *Certified Restoration Dry Cleaning Network, LLC, v. Tenke Corp.,* 511 F.3d 535, 550 (6th Cir. 2007); *Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir. 1992). Plaintiffs argue that Defendant's conduct, if allowed to continue, would further harm their professional and personal reputations, leading to loss of goodwill. (Motion, Doc. 4, Pg. ID 45.) In support of this argument, Plaintiffs state that many of the emails sent in Defendant's Campaign, including the most recent one, went to competing investment bankers and prospective clients. (*Id.*) These emails falsely accuse Plaintiffs of horrific crimes and membership in detestable hate groups. (*Id.*)

The Court finds Plaintiffs' argument persuasive. If allowed to continue, Defendant's conduct will cause great harm to Plaintiffs' business, as his actions have already targeted colleagues and clients alike. Monetary damages cannot fully compensate Plaintiffs for the loss of customer goodwill and trust that has resulted, and will further result, from Defendant's Campaign. Thus, the factor of irreparable harm weighs in Plaintiffs' favor.

### IV. Substantial Harm to Others or the Public

"The third and fourth prongs of the temporary restraining order analysis require

assessing the harm to the opposing party and weighing the public interest." *Mesa Indus., Inc. v. Charter Indus. Supply, Inc.*, No. 1:22-CV-160, 2022 WL 1044720, at *7 (S.D. Ohio Apr. 7, 2022) (cleaned up). As to the question of harm, there is no indication that the temporary restraining order would harm parties beyond this lawsuit. And, the narrowly tailored injunction preventing defendant from (1) creating new email accounts in furtherance of the Campaign, (2) accessing or deleting any existing email accounts in furtherance of the Campaign, (3) accessing or deleting any electronic files concerning Plaintiffs, or (4) coming within 100 yards of any Plaintiffs, the Plaintiffs' personal residences, or any Raymond James office works little harm to Defendant. After all, Defendant is not employed by Plaintiffs. Not to mention, courts may discount harm to a defendant when there is "evidence that the defendant 'knowingly and illegally' placed itself in a position to be harmed by injunctive relief." *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1021 (W.D. Tenn. 2015) (quoting *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006)).

The public interest also weighs towards granting limited relief. Given the strong interest in preserving First Amendment rights, "the public interest is better served by a cautious approach to injunctive relief in defamation cases." *Saidak v. Schmidt*, 501 F. Supp. 3d 577, 600 (E.D. Tenn. 2020) (quoting *Oliver v. Skinner*, No. 4:09-CV-29, 2013 WL 667664, at *10 (S.D. Miss. Feb. 22, 2013)). The narrowly tailored temporary restraining order focuses upon Defendant's potential conduct—rather than pure speech—and serves the public interest by effectuating the law, as well as preserving evidence to foster a fair and efficient adjudication of this matter. *Tri-Cnty. Wholesale Distrbs., Inc. v. Wine Grp., Inc.*, 565

15

F. App'x 477, 484 (6th Cir. 2012) (explaining that the statute "represents the legislature's judgment that enforcement of the statute is in the public interest"). Thus, the third and fourth factors support granting the temporary restraining order in part.

**V.      Security**

The Sixth Circuit directs district courts to "expressly address the question of whether a bond is required as security" for temporary restraining orders and preliminary injunctions. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978). Federal Rule of Civil Procedure 65(c) requires that the moving party give security in an amount that the court considers proper "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." That said, district courts have broad discretion in determining that amount or whether bond is needed at all. *Molton Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Courts generally do not require bond as a condition of a temporary restraining order when the order does not threaten damage to any person or property of the non-moving party. *News Herald, a Div. of Gannett Satellite Info. Network, Inc. v. Ruyle*, 949 F. Supp. 519, 523 (N.D. Ohio 1996).

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction seeks such relief with nominal bond because Defendant "will suffer no damages during the pendency of a restraining order." (Doc. 4, Pg. ID 51.) Indeed, Defendant will not suffer harm as a result of the conduct enjoined by this Order. Thus, the Court finds that Plaintiffs need not post bond. The Court shall revisit the issue of bond, if necessary, after the preliminary injunction hearing.

## CONCLUSION

Thus, the Court **GRANTS IN PART** Plaintiffs' Motion for a Temporary Restraining Order (Doc. 4) and **ORDERS** the following:

1. Defendant is **ENJOINED** from creating new email accounts in furtherance of the Campaign;

2. Defendant is **ENJOINED** from accessing existing email accounts previously mentioned in this matter in furtherance of the Campaign;

3. Defendant is **ENJOINED** from coming within 100 yards of: (a) Plaintiffs VanBenthuysen and Redvanley; (b) the personal residences of Plaintiffs VanBenthuysen and Redvanley; and (c) any Raymond James office;

4. Defendant is **ENJOINED** from using any electronic device to delete or otherwise access the following: (a) any electronic files concerning Plaintiffs; or (b) any email account used to transmit emails concerning Plaintiffs or any of their significant others; and

5. The Court will schedule a preliminary injunction hearing by separate entry once service has been perfected or actual notice has been given to Defendant, pursuant to Federal Rule of Civil Procedure 65(a)(1).

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

Filed 1/17/2025 at 4:00 P.M. EST         By: ___*/s/ Matthew W. McFarland*___
                                         JUDGE MATTHEW W. McFARLAND